# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

DARRELL BREEDING

Petitioner, : Case No. 3:26-cv-00065

- vs -

District Judge Thomas M. Rose
Magistrate Judge Michael R. Merz

BRIAN BAKER, WARDEN,
London Correctional Institution,

:

Respondent.

## DECISION AND ORDER

This habeas corpus case, brought by Petitioner Darrell Breeding with the assistance of counsel, is before the Court on the Objections of both the Petitioner (ECF No. 19) and the Respondent (ECF No. 20) to the Magistrate Judge's Report and Recommendations recommending dismissal of the Petition but granting a certificate of appealability ("Report," ECF No. 18). In the interest of judicial economy, the Recommittal Order entered by Judge Rice (ECF No. 21) is vacated.

Petitioner pleads only one ground for relief, to wit, that his conviction is not supported by sufficient evidence in that the act of which he was convicted – shooting from an attached garage through a door into the attached house after his unfaithful girlfriend had fled through that door -- does not violate Ohio Revised Code § 2923.161 because a house and an attached garage are part of the same "habitation" for purposes of that statute. The Report concluded that the statute, correctly interpreted, covers this conduct and the Petition should therefore be dismissed. Both

parties object.

**Petitioner's Objections**

**Statutory Construction**

The central question in this case is the correct interpretation of Ohio Revised Code § 2923.161 which reads: "(A) No person, without privilege to do so, shall knowingly do any of the following: (1) Discharge a firearm **at or into** an occupied structure that is a permanent or temporary habitation of any individual"(emphasis supplied).

The critical facts are undisputed. Petitioner's girlfriend, Diana Donaldson, was a permanent resident of 1157 Vester Avenue, in Springfield. Petitioner went there in the early morning hours of August 6, 1995, and used his key to enter the residence. When Donaldson did not answer his call, he retrieved her handgun. He then found her, undressed, in a car in the attached garage with another man. Angry for apparent reasons, he fired the gun at her "to frighten her" as she escaped through a door into the attached house. Testimony established a bullet hole in the door and the spent bullet was recovered inside.

Convicted by a jury, Petitioner absconded and was only re-arrested over twenty-four years later in Michigan. During the interim, several Ohio appellate courts had decided that firing a gun inside a residence to another point inside the same residence did not violate § 2309.161. Two other appellate courts had decided that trespass into an attached garage was enough to constitute trespass in a habitation for purposes the burglary statute. Based on these cases, Petitioner argues that what he did no longer can be held to have violated Ohio Revised Code § 2309.161.

The Report approached construction of the statute with the method proposed by Learned Hand, Henry Hart, and Albert Sacks: first discern what purpose a statute was intended to serve,

then interpret the statute to carry out that purpose to the extent the text will allow.[1] Although we have no legislative history from which to discern the precise purpose, § 2309.161 appears to be intended to deter shooting into residences in a way that may seriously injure persons inside but without, perhaps, targeting specific persons. There is a suggestion in the papers that drive-by shootings were the principal targeted evil, though the statute is not limited to vehicle-borne shooters.

Petitioner derides this approach, noting that the cited opinion of Learned Hand is eighty-one years old.[2] But if "we are all textualists now," as Petitioner argues, what does textualism suggest is the correct interpretation of the statute? The dictionary meaning of "habitation" is a place where someone resides[3] and there is no doubt that Petitioner's girlfriend resided in the house at 1157 Vester and that Petitioner fired a gun from the garage attached to that house through a door of the house through which his girlfriend had just escaped his wrath. As the Report demonstrates, no Ohio court has ever held that that set of facts does not satisfy Ohio Revised Code § 2309.161.

Petitioner cites two cases where appellate courts have held that discharging a weapon within a habitation does not satisfy the statute. But dictionary definitions of "into" do not include "within" or "inside of." He also cites two cases where appellate courts have held trespass in an attached garage is sufficient to invoke the burglary statutes which punish trespass in a habitation. But he cites no textualism rule which requires reading a word like "habitation" univocally in different statutes.

The meaning of words in human communication is heavily dependent on the context in

---

[1] Report, ECF No. 18, PageID 606-07, citing *Cabell v. Markham*, 148 F.2d 737, 739 (2nd Cir. 1945), and The Legal Process (Eskridge & Frickey ed. 1994),

[2] The decision, *Cabell v. Markham*, 148 F.2d 737, 739 (2nd Cir. 1945), is indeed old. It was handed down April 3, 1945, when FDR was still President of the United States and Adloph Hitler was still Chancellor of Germany.

[3] Webster's Third International Dictionary.

which those words are used and textualism in no way precludes examining context, particularly to determine what evil a criminal statute was intended to address.[4]

Looking to purpose in no way justifies ignoring the language of the text. It certainly could be argued that shooting into an "occupied structure" which is not a habitation (e.g. a courthouse) would involve many of the same risks as shooting into a "habitation," but the language of § 2309.161 could not legitimately be stretched to cover any "occupied structure." Nor could it plausibly be constructed to exclude a "habitation" just because no one was home at the time.

The statutory construction method employed in the Report is not inconsistent with a textualist reading of the statute. Petitioner cites the "well-settled rule of statutory interpretation" that "[t]he question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact." *City of Lancaster v. Fairfield County Budget Comm'n*, 83 Ohio St. 3d 242, 245 (1998) (quoting *Slingluff v. Weaver*, 66 Ohio St. 621, syllabus (1902)). The Report does not recommend adding to the text to discover the General Assembly's Intent, but rather considering its purpose to decide what it meant by the word "habitation."

**Following Precedent**

Petitioner objects that the Report does not follow the precedent set in *State v. Turner*, 2002-Ohio-54 (Ohio App. 2nd Dist. Jan. 4, 2002). In that case the defendant had aimed and fired two 9 millimeter weapons at a Toyota vehicle in the driveway of the house of the person he was angry with. Investigating Dayton Police officer Holmes "discovered a bullet hole in the front of the Arlene residence near the garage. Holmes said he did not recover the bullet that struck the house because it would have involved significant damage to the house." *Id.* at *2. The homeowner "Jerry Worthy testified he recovered a bullet from inside the garage wall a few days after the shooting."

---

[4] See Merz, The Meaninglessness of the Plain Meaning Rule, 4 Univ. Dayton Law Rev. 31 (1979).

*Id.* The defendant Turner claimed he would never have aimed at the house itself because his ten year old son was inside. *Id.* The trial court convicted Turner of violating § 2309.161 with the critical question being whether he had acted knowingly, the *mens rea* required by the statute. The Second District found that the trial court's conclusion that Turner had acted knowingly was not against the manifest weight of the evidence because he "was aware he would probably hit the garage area with his gun if his shots ricocheted off the vehicle or missed the vehicle." Thus the Second District was not asked to decide if the garage was part of the habitation but only if Turner had acted knowingly. Any implication that the Second District decided the garage in that situation was part of the habitation would be pure dicta.

**New Evidence of Actual Innocence**

Petitioner claims he is actually innocent of the crime of which he was convicted and that that will excuse his late filing and any procedural default. The Report concluded "[p]roof of actual innocence requires submission of new evidence. . . and Petitioner has submitted no new evidence at all." (ECF No. 18, PageID 607 citing *McQuiggin v. Perkins*, 569 U.S. 383 (2013).

Petitioner admits he has not submitted any new evidence, but claims that is not necessary, relying on *Bousley v. United States,* 523 U.S. 614 (1998)(Objections, ECF No. 19, PageID 617).

Bousley pleaded guilty to violating 18 U.S.C. § 924(c)(1) in connection with drug trafficking even though the firearms were in a different part of the house from the drug transactions. While Bousley's appeal was pending, the Supreme Court held that a conviction for "using" a firearm under § 924(c)(1) requires the Government to show "active employment of the firearm, and not its mere possession" *Bailey v. United States,* 516 U.S. 137 (1995). Although Bousley had procedurally defaulted his claim, the Court held "he may be entitled to a hearing on its merits if he makes the necessary showing to relieve the default." It then confirmed that the required showing

as that specified in *Schlup v. Delo*, 513 U.S. 298 (1995), *Bousley* at 623.

In *Souter v. Jones,* 395 F.3d 577, (6th Cir. 2005), the Sixth Circuit specified the sort of new evidence required by *Schlup*:

> [I]f a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup v. Delo,* 513 U.S. 298, 316 (1995)." Thus, the threshold inquiry is whether "new facts raise[] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id*. at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321.

*Souter* at 590. Thus *Bousley* requires that a petitioner satisfy *Schlup* before he can rely on new precedent. Breeding has not satisfied *Schlup*. Indeed he has not submitted any new evidence at all.

**Petitioner's "Unusual Circumstances"**

Petitioner objects that the Report "Does Not Recognize the Unusual Circumstances Surrounding Mr. Breeding's Delayed Incarceration." The circumstances referred to are advice from Breeding's appellate counsel, Daniel J. O'Brien, and Breeding's current medical conditions.

On January 26, 2001, the Ohio Second District Court of Appeals affirmed Breeding's

conviction. *State v. Breeding*, 2001 WL 62381 (Ohio App. 2d Dist. Jan. 26, 2001). O'Brien apparently got notice of the decision the same day because he wrote to Breeding stating:

> Judge Lorig has left a message at my office that he wants Darrell to report to the Sheriffs Office Monday morning January 29, 2001 at 8:30 a.m. I believe, however, that the Court of Appeals set the Bond in this cause. If this is so, Judge Lorig has lost jurisdiction.
>
> We have 45 days from today's date in order to file an [sic] Memorandum in Support of Jurisdiction and Notice of Appeal appealing this decision.
>
> As soon as the dust settles, please make an appointment to come in.

(ECF No. 3-1, PageID 35, attached to Breeding's Affidavit). Breeding avers that "Based on my lawyer's statements and legal advice, I did not appear before the trial court or the Sheriff's Office while the bond issues remained pending." So far as the record shows, Breeding never consulted further with O'Brien. The record belies O'Brien's understanding of which court set a bond in that Common Pleas Judge Lorig forfeited the bond on January 31, 2001, when Breeding failed to appear (Capias, State Court Record, ECF No. 7, Ex. 48). In any event advice of counsel is not an excuse for fleeing the jurisdiction which Breeding did successfully for over twenty years.

In his Affidavit, Breeding gives a list of his current medical conditions unsupported by any documentation either as to diagnosis or required treatment. Assuming the report of conditions is accurate, medical conditions in 2026 do not make a 2001 conviction unconstitutional.

**Respondent's Objections**

The Magistrate Judge's Report concluded:

> Because the Petition presents a novel question of interpretation of Ohio law with which reasonable jurists could disagree, it is also recommended that Petitioner be granted a certificate of appealability on the questions whether he has presented (1) a cognizable claim of insufficiency of the evidence and (2) whether he has presented a cognizable claim of actual innocence to excuse his untimeliness and procedural default.

Report, ECF No. 18, PageID 608.

A certificate of appealability in a habeas corpus case upon a finding that that jurists of reason could disagree with the district court's resolution of his constitutional claims **or** that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)(emphasis added). The statutory interpretation question at the heart of this case is one on which reasonable jurists could disagree, given the varying interpretations of Ohio Revised Code § 2309.161 which have been given by Ohio appellate courts. Petitioner, who is able to afford counsel, deserved encouragement to proceed further on that issue and on the issue of whether a new interpretation of a statute can suffice to show actual innocence, absent new evidence.

**Conclusion**

Having reviewed the case *de novo* with particular attention to the objections raised by both parties, the Court adopts the Report and overrules the Objections. The Clerk will enter judgment dismissing the Petition with prejudice. Petitioner is granted a certificate of appealability on the two issues on which the Magistrate Judge recommends a certificate.

September 4, 2026 s/Thomas M. Rose

Thomas M. Rose
United States District Judge